# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 12-CR-594 (JFB)
_____

UNITED STATES OF AMERICA,

versus

JUVENILE MALE,

Defendant.
_____

**MEMORANDUM AND ORDER**
July 12, 2013
_____

JOSEPH F. BIANCO, District Judge:

On September 18, 2012, the government filed a Juvenile Information against defendant Juvenile Male[1] ("Juvenile Male" or "the defendant"), an alleged member of the MS-13 street gang, charging him with one count of conspiracy to commit Hobbs Act Robbery, 18 U.S.C. § 1951(a); six counts of Hobbs Act Robbery, 18 U.S.C. § 1951(a); and six counts of brandishing and discharging firearms during the commission of a crime of violence, 18 U.S.C. § 924(c). Specifically, the defendant's charges arise from his involvement in a series of armed robberies that took place between December 2011 and February 28, 2012: the Health Mart robbery that occurred on February 28, 2013; the Mi Tierrita Restaurant robbery that occurred on February 12, 2012; the Iglesia Church robbery that occurred on January 11, 2012; the Lempa Delicatessen robbery that occurred on January 4, 2012; the Off The Track Quick Mart robbery that occurred on January 6, 2012; and the Chapi Delicatessen robbery that occurred on January 26, 2012. The government also moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult, which is still pending.

On March 15, 2013, the defendant moved to suppress statements he made to law enforcement officers after his arrest on February 28, 2012, arguing that (1) he is not competent to be questioned in English or to waive his *Miranda* rights in English (and that, therefore, he could not understand the substance of the statements as they were

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

written by the officers in English, nor could he waive his rights knowingly and voluntarily), and (2) he was coerced into providing the statements to the officers. The defendant also moved to suppress the evidence seized from his home on February 29, 2012, arguing that the search of the premises was conducted in the absence of a warrant.[2] On May 2, 2013, the government opposed the motion to suppress. The Court conducted an evidentiary hearing regarding the defendant's motion on May 23 and 31, 2013. The Court allowed the defendant to submit a post-hearing memorandum, which was filed on June 12, 2013. The government responded by letter dated June 28, 2013.

For the reasons that follow, the motion to suppress is denied. In particular, the defendant argues, *inter alia*, that his post-arrest statements should be suppressed because he is not competent in English and because the statements were the product of coercive police tactics, and that the evidence obtained pursuant to a search of his home should be suppressed because there was no probable cause for the issuance of the search warrant.

Having conducted a full evidentiary hearing (including an evaluation of the demeanor of the testifying witnesses), the Court finds the defendant's version of the events in his affidavit to be wholly incredible and, instead, fully credits the version of the interviewing detectives, as elicited at the hearing. Based on all of the

evidence produced during the suppression hearing, and based on its evaluation of the credible testimony elicited at the hearing, the Court concludes that the defendant's arguments for suppression of his post-arrest statements and evidence seized from his home are without merit.

First, the Court finds that the defendant had a sufficient command of the English language to waive his rights, be questioned, and give post-arrest statements in that language. Second, the Court concludes that none of the defendant's post-arrest statements were made involuntarily; it is clear that the defendant voluntarily confessed to the crimes in question, and that no coercive or improper inducement tactics were employed by the detectives that questioned the defendant. In short, the government has met its burden of proving that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights and gave the post-arrest statements. Finally, the Court finds that the defendant knowingly and voluntarily consented to the search of his home. The Court also finds that there was, in fact, probable cause for the issuance of the search warrant for the defendant's home, and that even in the unlikely event that probable cause did not exist, the exclusionary rule is not served by suppressing the evidence obtained pursuant to the search under the facts of this particular case. For all of these reasons, the Court finds that the government has met its burden of proving, by a preponderance of the evidence, that the defendant's post-arrest statements and the evidence obtained from the defendant's home on February 29, 2012, should not be suppressed.

## I. FINDINGS OF FACT

The Suffolk County Police Department ("SCPD") detectives who detained and

---

[2] The government produced a valid warrant at the suppression hearing, and the defendant appears to have abandoned that argument in his post-hearing submission. Instead, following the hearing, the defense argued that the evidence obtained from the February 29, 2012 search should be suppressed because (1) there was no probable cause for the issuance of the search warrant, and (2) the true use and intent of the Consent to Search form was misrepresented to the defendant before he signed it.

interviewed the defendant on the day of his arrest testified at the suppression hearing. The defense called one witness, a childhood friend who testified about the defendant's education and difficulty speaking English.[3] After evaluating the credibility of the witnesses (including their demeanor) and the other evidence offered at the evidentiary hearing, as well as the defendant's affidavit, the Court makes the following findings of fact.

On February 28, 2012, a Health Mart Pharmacy in North Bay Shore, New York, was robbed. (Tr. 9:4-17.)[4] SCPD Detective Thomas E. Reilly was told that three Hispanic males wearing masks had committed the robbery. (*Id.* 48:15-49:4.) When Detective Reilly arrived on the scene of the crime, he witnessed four suspects standing outside of their vehicle, a Mustang. (*Id.* 52:13-17.) The individuals, including the defendant, were placed under arrest in connection with the Health Mart robbery at approximately 10:00 p.m., and were taken to the Third Precinct for questioning. (*Id.* 10:6-21, 55:15-23, 94:21-95:5.)

### A. Detective Reilly's Interview: The Health Mart Robbery and the Defendant's Consent to Search

Detective Reilly interviewed the defendant at approximately 11:50 p.m. on February 28, 2012, in a room at the Third Precinct. (*Id.* 11:17-21.) He was accompanied by Detective George Michels. (*Id.* 12:2-5.) Upon entering the interview room, Detective Reilly asked the defendant if he spoke English, a question to which the defendant responded "yes." (*Id.* 12:6-14; 18:14-18.) Detective Reilly also asked the defendant if he could read English, and the defendant answered in the affirmative. (*Id.* 66:7-10.) Detective Reilly testified that Spanish-speaking detectives were available, but that he did not utilize them because the defendant spoke English (*id.* 40:12-20), and never requested the aid of a Spanish interpreter (*id.* 87:22-24). Detective Reilly informed the defendant that he was at the Third Precinct because of the Health Mart robbery that occurred that night, and then read him his *Miranda* rights from a "Rules of Interrogation" card (with the card facing the defendant so that he could read along as

---

[3] The defendant also submitted an affidavit in which he stated, *inter alia*, that police officers yelled at him, threatened him, and punched him in the face when he refused to answer their questions after he was first taken into custody. (Juvenile Male Aff. at ¶¶ 3-4.) The defendant claims that he began to answer the officers' questions out of fear – after his lip bled for an hour from being punched, and after he saw a friend of his who was also taken into custody with a broken nose and a swollen face. (*Id.* ¶ 4.) He also claims that he was denied food or drink for hours while in custody. (*Id.* ¶ 8.) In addition, the defendant challenges the government's contention that he was informed of his rights on the evening he was taken into custody. The defendant contends that he was not warned of his rights until the following day, after written statements had already been prepared for him to sign. (*Id.* ¶ 5.) Finally, the defendant stated that, because his primary language is Spanish and his English is weak, he asked for a Spanish interpreter while in custody, but that none was provided and, instead, the written statements were read to him rapidly in English. (*Id.* ¶ 7.) He also claims that the consent to search form was provided to him to sign, but that its contents were never read to him. (*Id.* ¶ 11.) To the extent the defendant's affidavit conflicts with the testimony of the interviewing detectives, the Court finds the defendant's version of events to be not credible in light of the totality of the evidence, including the Court's evaluation of the credibility of the SCPD detectives who testified at the hearing. Instead, having conducted the hearing, the Court finds the detectives' version of events (discussed *infra*) to be fully credible.

[4] "Tr." refers to citations to the transcript of the evidentiary hearing, and "Ex." refers to exhibits admitted during the suppression hearing.

Detective Reilly read out loud). (*Id.* 12:16-14:16; Ex. 1.) After reading each line, Detective Reilly paused to ask the defendant if he understood; the defendant answered that he understood what had been read after each pause. (Tr. 67:9-18.) Detective Reilly then read the two waiver questions printed on the card (inquiring as to whether the victim understands his rights and whether he, having been informed of his rights, now wishes to speak to law enforcement). The defendant answered the waiver questions in the affirmative. Detective Reilly denoted the defendant's responses and also asked the defendant to initial both questions to confirm that his response to each question was, in fact, "yea." (*Id.* 15:11-16:24.) Detective Reilly then had the defendant sign the card. (*Id.* 17:2.) Detective Reilly testified that, during the course of their exchange, he had no difficulty understanding the defendant and the defendant did not appear to have any trouble understanding him. (*Id.* 18:7-13.)

Detective Reilly also asked the defendant for permission to search his house. He received the defendant's permission in writing. (*Id.* 19:10-16; Ex. 2.) Detective Reilly prepared the consent to search form, read the form to the defendant, explained the wording of the form, and gave the defendant an opportunity to examine the document before asking him to sign it. (Tr. 20:16-21:16; 70:7-15.) Detective Reilly also explained to the defendant that, by signing the form, he was giving the SCPD permission to search his room and his house. (*Id.* 71:1-4.) Detective Reilly also informed the defendant that, by signing the form, he was agreeing that anything found in the search could be used against him in a court of law. (*Id.* 75:14-76:5.) The defendant signed the consent to search form at approximately 11:52 p.m. (*Id.* 21:17-25.)

During the interview with Detective Reilly, the defendant initially stated that he was playing soccer with three others (the three individuals with whom he was arrested) on the night of the Health Mart robbery, and that they went to a McDonald's on Deer Park Avenue at the time of the robbery. (*Id.* 22:7-11; 97:17-24.) The defendant also provided Detective Reilly with some information about a murder that occurred nearby, information that Detective Reilly later shared with the Homicide Section. (*Id.* 23:20-24:24.) Detective Michels left while Detective Reilly and the defendant were discussing the murder. He went to the McDonald's on Deer Park Avenue to see if the defendant was on the restaurant's surveillance tapes. He was not. (*Id.* 25:12-24.) Eventually, the defendant admitted to Detectives Reilly and Michels that he was involved in the Health Mart robbery. (*Id.* 26:3-4.) The defendant stated that, on the day of the robbery, he was the driver (and that he remained in the car while the three others went in to rob the Health Mart). (*Id.* 26:7-11.)

The Detectives then took a statement from the defendant regarding the commission of the Health Mart robbery. (*Id.* 27:2-5; Ex. 3.) First, Detective Reilly re-read the defendant his *Miranda* rights from the Suffolk County arrest form upon which he later took the defendant's statement. He read them line by line, and had the defendant initial each line after it was read to denote his understanding and acceptance. (Tr. 28:6-25; Ex. 3.) He also read the waiver questions from the form, wrote the defendant's answer to each question, had the defendant initial next to each answer, and then had the defendant sign the form. (Tr. 29:15-30:17; Ex. 3.) Detective Reilly finished reading the defendant his rights for the second time that evening at approximately 2:10 a.m. (Tr. 31:1-6.)

Detective Reilly then took the defendant's statement about the Health Mart robbery. The defendant stated that he went to the Health Mart a week early to gather information, *i.e.*, how many people were in the store at the time and the store's hours. The defendant was the driver on the night of the robbery – he parked the car in the woods and his friends went into the store (each friend had a gun, but only two of the guns were loaded). The defendant stated that, after ten minutes, his friends returned (without money). He drove them to his house so that they could change their clothes and he placed their guns in the boiler room. (Ex. 3.) Detective Reilly testified that he took the statement two sentences at a time – he wrote down two sentences, read them back to the defendant, and then moved on to the next two sentences. When he got to the end of the three-page document, he read the entire statement out loud to the defendant, asked him to sign the statement, had him swear to the truth of the statement, and asked him to make and sign off on any corrections to the statement. (Tr. 31:14-32:25.)

## B. Detective Reilly's Interview: The Mi Tierrita Restaurant Robbery

Detective Reilly had been assigned to investigate an armed robbery that occurred at the Mi Tierrita Restaurant in Brentwood, New York, on February 12, 2012. (*Id.* 8:17-9:3.) During the February 28, 2012 interview, he also questioned the defendant about the restaurant robbery. The defendant stated that he and two others went to rob a bakery on Brentwood Road near the Brentwood Railroad Station, but it was closed when they got there. Instead, they parked their car behind Mi Tierrita, entered from the rear, and robbed the restaurant. (*Id.* 33:7-24.) Detective Reilly then proceeded to take a statement from the defendant about

the Mi Tierrita robbery. Detective Reilly testified that he informed the defendant of his rights again and had him sign off on the waiver questions, both orally and in writing. (*Id.* 35:8-37:20; Ex. 4.)

Detective Reilly then took a statement from the defendant, reading it out loud to him as he went along, and asked the defendant to sign the statement when it was complete and to make any necessary corrections. (Tr. 37:21-38:22.) The defendant stated that his friends had three guns when they went to rob the restaurant. He stated that he was personally carrying a loaded semi-automatic hand gun. He and his friends entered from the back door and grabbed two men who were standing in their way. The defendant stated that it was his job to keep those people on the floor. Waitresses then started collecting money off the tables, which the defendant took and put in his jacket. His friends went to get money out of the safe. As they were walking out, one of them slipped, causing his gun to go off. The defendant and his friends drove back to the defendant's house, where the defendant hid the guns and masks. In total, they stole approximately $4,000. (Ex. 4.)

## C. Detective Michelis' Interview: The Iglesia Church Robbery

Detective Michelis questioned the defendant about a robbery that had occurred at the Iglesia Church on January 11, 2012. They spoke about the robbery for approximately 15 to 20 minutes, and the defendant gave a written statement about the incident. (Tr. 104:1-11; Ex. 5.) Detective Michelis explained the form that he was using to take the statement of the defendant. He went through each of the *Miranda* rights, asking the defendant to place his initials on each line as the corresponding right was read to him. (Tr. 105:16-106:19.)

He also read the waiver questions to the defendant; he asked the defendant if he understood each question before the defendant initialed next to his response. (*Id.* 106:20-25.)

Detective Michelis then began writing the defendant's statement based on the notes he had taken about the Iglesia Church robbery while speaking to the defendant about the incident. He occasionally asked the defendant questions to clarify certain details and, when he finished writing the statement, read it to the defendant as the statement sat in front of him so that the defendant could follow along word for word. (*Id.* 107:20-108:12.) In his statement, the defendant explained that he and three of his friends went to the Church with the intent to rob it on that particular evening because they had learned, from one of the friend's grandmother, that on that day members of the Church were supposed to bring and hand over $2,000. He and his friends went to the back of the Church. The defendant stated that he was carrying a .25 caliber semi-automatic in the pocket of his hooded sweatshirt, and that one of his friends was also carrying a hand gun. They were unable to find money. Instead, they stole two laptop computers and three digital cameras, which they later sold. They also stole a lock box, but it turned out to be empty. (Ex. 5.) The defendant placed his initials next to any corrections that he made to the statement as it was read. (Tr. 109:6-13.) Detective Michelis testified that he read the statement to the defendant, rather than have him read it alone, because the defendant had expressed that reading English was difficult for him, but that he could understand and speak the language. (*Id.* 108:4-12.) The defendant then signed all three pages of the statement. (*Id.* 108:24-25.)

### D. Detective Michelis' and Detective Ziegler's Interviews: The Lempa Delicatessen Robbery

After Detective Michelis took the defendant's statement about the Iglesia Church robbery, he started to ask the defendant some questions about a robbery that had occurred on January 4, 2012, at the Lempa Deli in Brentwood, New York. (*Id.* 109:18-20.) Detective Steven Ziegler accompanied Detective Michelis during this line of questioning. (*Id.* 109:22-110:8; *id.* 182:24-183:4.) The defendant stated that he was involved in the robbery of the Lempa Deli on Calebs Path in Brentwood. He outlined the facts of the robbery and his involvement for the detectives. (*Id.* 110:12-19.) After about a half hour of talking about the robbery, Detective Ziegler left the room. Detective Michelis then asked the defendant if he would be willing to give a statement about the deli robbery. The defendant agreed and Detective Michelis went through the same process of detailing the defendant's rights and obtaining his waiver of those rights. (*Id.* 110:23-111:5; Ex. 6.)

Detective Michelis then put together the written statement from the notes he took during their oral conversation about the robbery and from information he gathered when asking follow-up questions while writing the statement. When he finished writing, he went through the statement with the defendant, had the defendant initial any corrections that had to be made, and asked the defendant to sign all three pages of the document. (Tr. 113:16-24.) In his statement, the defendant explained that he and three friends robbed the Lempa Deli. He stated that he was carrying a 9mm semi-automatic handgun at the time, and that one of his friends was carrying a semi-automatic handgun and that another was carrying a large knife. Upon entering the deli, the

defendant's friend pointed his gun at a dishwasher and the defendant pointed his gun at a woman. Another friend used the dishwasher's shoelaces to tie up two other guys who were in the vicinity. The defendant's friend then walked out with $4,000, which they split four ways. (Ex. 6.) The defendant signed the document and swore to its truth. (Tr. 114:7-15.) Michelis testified that he did not use Spanish officers to interpret during his conversations with the defendant because it was clear that the defendant was able to communicate fine in English (that he could understand the detectives and the detectives were able to comprehend what he had to say in English). (*Id.* 115:12-18; 120:10-18 (Detective Michelis testifying that they were communicating "fine" in English, and that even if reading English was difficult for the defendant, it was clear that he could understand most of the words).)

Later that day, Detective Ziegler spoke to the defendant again about the Lempa Deli robbery. He spoke with the defendant in English, and testified that they had no trouble understanding each other. (*Id.* 190:11-17.) He asked the defendant to view still photographs that had been generated from the video surveillance at the deli. (*Id.* 184:13-21; Exs. 7, 8, 9.) Detective Ziegler uncuffed the defendant and asked him to identify the people in the photos one by one. (Tr. 186:20-22.) The defendant circled the individuals, wrote their names, and wrote at the bottom of the photo that "this is Lempa Deli where we robbed" and signed and dated the photo. (*Id.* 187:19-20; Ex. 7.) The defendant identified one of the figures as "me" in a photo of three individuals walking towards the back door of the Deli. (Tr. 187:23-188:16; Ex. 8.)

E. Detective Caputo's Interview: The Off The Track Quick Mart Robbery

A robbery occurred at the Off The Track Quick Mart in Babylon, New York, on January 6, 2012. Ted Caputo, a SCPD Detective in the First Precinct, was assigned to the investigation of that robbery. (Tr. 123:11-13.) On the morning of February 29, 2012, Detective Caputo was called to report to the Third Precinct to interview the four individuals that had been arrested, including the defendant, to see if any of them had information about the Off The Track Quick Mart robbery. (*Id.* 124:2-14.) Detective Caputo entered the defendant's interview room at approximately 12:45 p.m. (*id.* 125:23-25), and proceeded to ask him questions about his background (*id.*127:9-22.) Detective Caputo spoke to the defendant entirely in English, and testified that there were no communication issues. (*Id.* 127:11-16.) Although Spanish interpreters were available, he did not utilize them because, based on his communications with the defendant, he felt confident that the defendant could understand him when he spoke in English and that he could understand the defendant when the defendant spoke in English. (*Id.* 136:8-17.)

Detective Caputo then read the defendant his *Miranda* rights from a rights card. (*Id.* 128:2-3.) He also asked for the defendant's permission to take a statement about the Off The Track Quick Mart robbery. The defendant agreed. (*Id.* 128:4-17; Ex. 10.) Detective Caputo then went through the rights, as listed on the top of the statement form, again with the defendant, reading them line by line with the form facing the defendant so that he could follow along. (Tr. 129:9-17.) Detective Caputo also read the defendant the waiver questions, had him state his answer out loud, and had him initial next to his responses. (*Id.* 130:12-

131:21.) Detective Caputo then filled out the statement about the robbery line by line, as the defendant recanted it to him. (*Id.* 132:5-10.) The defendant stated that he and three friends were in a car when they saw the store near the train station. The defendant stated that he dropped his friends off around the corner, and that he drove around until one of them called him asking him to pick them up. The defendant then drove them all back to his house, where they split up the $100 they had stolen from the store. (Ex. 10.) When the defendant was done, Caputo moved next to him and read the statement in full out loud with the paper facing the defendant so that he could follow along. (Tr. 132:13-18.) The defendant pointed out any mistakes in the statement to Detective Caputo as he read through it. Detective Caputo testified that some of his mistakes were made on purpose, "[j]ust to make sure [the defendant] was reading along with me and he would point it out." (*Id.* 133:8-9; *id.* 134:7-9 ("Q. And why did you make those mistakes on purpose? A. Just to make sure that he was following along with me.").) Detective Caputo read up until the last line, which he asked the defendant to read out loud to make sure that the defendant was, in fact, able to read his hand writing. The defendant read the last line without any difficulty. (*Id.* 134:17-24.) The defendant then initialed all of the corrections that had been made to the statement (*id.* 135:9-14), and signed and swore to the truth of the statement (*id.* 135:16-21).

Detective Caputo returned to the defendant's interview room later that day, at approximately 4:15 p.m. (*Id.* 137:9-11.) He showed the defendant a photograph of an individual, whom the defendant identified as his friend who was also arrested on the evening of February 28, 2012. (*Id.* 137:14-138:19.) Detective Caputo asked the defendant if he would write out the

identification on the photograph. The defendant proceeded to write the following: "this is [name of friend] he was with us on Babylon when we got the money from the Deli." (Ex. 11; *see also* Tr. 138:22-139:2.) The defendant also signed and dated his statement. (Ex. 11; *see also* Tr. 139:3-5.)

## F. Detective Murphy's and Detective Mancusi's Interview: The Chapi Deli Robbery

SCPD Detective Daniel Murphy of the Second Precinct had been assigned the investigation of the Chapi Deli robbery, which occurred on January 26, 2012. (Tr. 149:21-22.) He received a call to report to the Third Precinct on February 29, 2012, because there were individuals in custody who were believed to have been involved in that robbery. (*Id.* 150:13-151:4.) He arrived at the Third Precinct at approximately 9:45 a.m. He interviewed the defendant at approximately 11:55 a.m. with Detective Mancusi. (*Id.* 153:12-154:1.) Detective Murphy introduced himself to the defendant and then issued the *Miranda* warnings off of a *Miranda* card. (*Id.* 154:11-19; Ex. 17.) After he read each line from the card, Detective Murphy confirmed with the defendant that he understood what was said. (Tr. 155:3-25.) Detective Mancusi also read the waiver questions, had the defendant respond out loud, and then sign the card. (*Id.* 157:1-24.)

Detective Mancusi then began speaking with the defendant about the Chapi Deli robbery. The conversation lasted for approximately 20 to 25 minutes. (*Id.* 156:10-12.) Detective Mancusi testified that he had no problems understanding the defendant when the defendant spoke in English, and that the defendant did not appear to have any problems understanding him when he spoke in English. (*Id.* 173:2-7.) The defendant

explained that he was involved in the crime and he named the other individuals who committed the crime with him. (*Id.* 158:7-9.) The defendant also told Detective Mancusi that he and his friends took a safe from the Deli to an abandoned house, and he worked with Detective Mancusi to sketch a map to show where the abandoned house was located. (*Id.* 159:2-8; Ex. 14 (map drawing).) The defendant placed his name and date on the bottom of the map sketch when it was finished. (Tr. 166:7-12.) SCPD detectives used the map to try and recover the safe. The detectives were, in fact, able to locate the safe at the house to which the defendant directed them. (*Id.* 166:18-25.)

During their conversation, Detective Mancusi also presented printed still shots from surveillance video of the robbery in question. He asked the defendant if he could point out and identify the individuals in the pictures. (*Id.* 158:16-21; Ex. 13 (four photos from video surveillance tapes).) The defendant circled himself in the pictures and wrote his name and date on the image. (Tr. 161:2-12; Ex. 13.) The defendant also identified the other individuals that appeared in the photographs. (Tr. 162:2-18.) The defendant further indicated that he and most of his friends were part of the MS-13 gang. (*Id.* 174:12-13.)

Based on all of this information, Detective Mancusi proceeded to take a statement from the defendant. Detective Mancusi first stated the defendant's *Miranda* warnings again (going over them in the same fashion that he did when he first entered the room). (*Id.* 168:18-170:18 (testifying that each line was read to the defendant, that the defendant provided a verbal response to the questions, that the defendant initialed each line, and that he then signed the document under the rights sections).) Detective Mancusi went through the statement line by line with the defendant. He then handed the statement to the defendant for him to read. He asked the defendant to read the first line out loud to make sure that he could read the statement. He had no problem doing so. (*Id.* 171:3-23.) Detective Mancusi told the defendant to sign each page of the statement if he agreed with its contents, which he did. (*Id.* 172:3-10.)

G. Detective McLeer's Testimony

John McLeer, an SCPD Detective in the homicide squad, testified that he was called to the Third Precinct at approximately 9:15 a.m. on February 29, 2012 because an arrested individual wanted to speak to a homicide detective about an earlier murder. (*Id.* 234:3-12.) He arrived at the Third Precinct just before 9:30 a.m. and proceeded to interview the defendant. (*Id.* 235:11-20.) Detective McLeer spoke to the defendant in English. (*Id.* 238:21-22.) Detective McLeer testified that the defendant spoke about the Sotomayor homicide (which occurred on November 2, 2011), identifying "two weapons used in the homicide, two individuals involved in the homicide, where he was at the time of the homicide, what he was doing, things that had occurred directly after the homicide, and also what had been done with these weapons the morning after the homicide took place." (*Id.* 236:10-15.)

Detective McLeer then asked the defendant if he was willing to give a statement, to which he responded yes. (*Id.* 236:16-21.) Detective McLeer reduced his handwritten notes taken during the initial interview into a statement. He and the defendant "sat together and created [the] statement." (*Id.* 236:22-25; Ex. 18.) Detective McLeer testified that, although they discussed the defendant's rights, he did not formally advise the defendant of his rights or ask the defendant to waive them

because the defendant was not a suspect in the homicide, and was therefore not incriminating himself based on his description of the murder. (Tr. 238:3-12.)

## H. Search Warrant

A search warrant for the defendant's home was prepared on the morning of February 29, 2012. Detective Steve Gargan was asked to prepare the search warrant. (*Id.* 196:15-21.) Detective Reilly assisted Detective Gargan in preparing the warrant (*id.* 40:3-11), as did Assistant District Attorney Megan O'Donnell (*id.* 197:22-198:4). The warrant was eventually brought to Judge Baisley, in Suffolk County, to be signed. (*Id.* 198:25-199:9.) Judge Baisley signed the warrant at approximately 4:00 a.m. on February 29, 2012. (*Id.* 199:14-18; Ex. 15 (Signed search warrant and attached exhibits).)

The search warrant for the defendant's home was executed at 10:00 a.m. on February 29, 2012. (*Id.* 200:5-6.) Ultimately, every room in the defendant's house was searched pursuant to the search warrant. (*Id.* 72:5-7.) Emergency search officers first entered the home, and then detectives followed. (*Id.* 210:11-19.) The original search warrant was never filed with the Suffolk County District Court, but was instead turned over to ADA O'Donnell. (*Id.* 214:13-215:7.)

## II. LEGAL STANDARDS

### A. Admissibility of Post-Arrest Statements

To introduce a defendant's custodial statements at trial, the government must show by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights

against self-incrimination.[5] *See Colo v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Diallo*, 206 F. App'x 65, 66 (2d Cir. 2006). Thus, the government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights under *Miranda* and that he knowingly, intelligently, and voluntarily waived those rights. *See Lego v. Twomey*, 404 U.S. 477, 482-89 (1972). For a waiver to be voluntary, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. In addition, for a defendant to make a knowing and intelligent waiver, he must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, the accused need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Instead, the accused need only be aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind,

---

[5] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that "in order to combat [the pressures surrounding in-custody interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467. Accordingly, "prior to the initiation of questioning," the government must inform a suspect of "the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468-70). Once an accused is informed of these rights, he may waive them "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *Moran*, 475 U.S. at 421.

which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993).

Moreover, it is well settled that the actual statements of a defendant are admissible only if they are made voluntarily. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000). The statements must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). When a confession is challenged as having been involuntarily made, the burden rests with the government to prove that the defendant's confession was, in fact, voluntary. *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (citing *Connelly*, 479 U.S. at 168); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) ("The prosecution bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary.").

"'A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given.'" *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see, e.g.*, *United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) ("A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne." (citation omitted)). A confession is thus "involuntary" if it is obtained by "'techniques and methods offensive to due process,' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)); *see also id.* at 312 (defining actual coercion as "physical violence or other deliberate means

calculated to break the suspect's will"). Under the Fifth Amendment, a defendant's involuntary confession is not admissible at trial. *Dickerson*, 530 U.S. at 433.

"[W]hether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances." *Haynes*, 373 U.S. at 513-14. "The factors to be considered include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (citation and internal quotation marks omitted)); *see also Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988) ("In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."). "The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Green*, 850 F.2d at 902. The conditions under which a suspect is questioned includes "the place where an interrogation is held, and the length of detention." *Id.* (internal citations omitted). The final factor, the conduct of law enforcement, is of particular importance because "a defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164. However, the determination of whether a defendant's statement was voluntary is highly fact-specific, *see Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998), and no single criterion controls, *see Nelson*, 121 F.3d at

833. "The overall inquiry into whether a statement was voluntarily given, therefore, is to consider the totality of the circumstances of the interview to determine if the accused's will was somehow overborne by the agent's coercive conduct." *United States v. Yousef*, 925 F. Supp. 1063, 1074 (S.D.N.Y. 1996). This totality of the circumstances test is properly utilized when the interrogation of juveniles is involved. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (explaining that the "totality-of-the-circumstances approach is adequate . . . even where interrogation of juveniles is involved"); *see also United States v. Burrous*, 147 F.3d 111, 116 (2d Cir. 1998) ("In the case of interrogation of a juvenile, we examine the totality of the circumstances culminating in the waiver.").

## B. Admissibility of Evidence Seized Pursuant to a Search Warrant

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "To establish probable cause to search a residence, two factual showings are necessary – first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). When determining whether probable cause is sufficient to support a search warrant for a particular location, "the applicable standard . . . is that there be a fair probability that the premises will yield the objects specified in the search warrant." *Id.* at 346.

The Supreme Court has instructed reviewing courts to accord "great deference" to a neutral magistrate judge's finding of probable cause. *United States v. Leon*, 468 U.S. 897, 914 (1984). However, the Supreme Court has also held that, notwithstanding the deference that a magistrate deserves, "a reviewing court may properly conclude that . . . the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, or because the form of the warrant was improper in some respect." *Id.* at 915 (internal citation omitted).

The Supreme Court has also held that "suppression of evidence obtained pursuant to a [subsequently invalidated] warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918; *see also id.* at 919-20 (explaining that, because the "purpose of the exclusionary rule is to deter unlawful police conduct," excluding evidence obtained pursuant to a warrant will not further the ends of the exclusionary rule in situations where the offer's conduct was objectively reasonable – situations where the law enforcement officer had no knowledge that the search was unconstitutional under the Fourth Amendment (citations omitted)).

## III. DISCUSSION

### A. The Defendant's Post-Arrest Statements

The Court finds that, based on the totality of the circumstances, each of the defendant's post-arrest statements was voluntarily given. Moreover, the Court finds that each post-arrest statement was made after a voluntary, knowing, and intelligent waiver of the defendant's *Miranda* rights. In moving to suppress the statements, the defense argues that (1) the defendant is not competent in English (and, therefore, cannot voluntarily give statements and waive his rights in the language), and (2) the

statements were a product of coercion and improper inducement. As discussed in detail below, the government put forth overwhelming evidence indicating that (1) the defendant is able to effectively communicate in English, and (2) the defendant was not physically coerced, but rather voluntarily provided his post-arrest statements to SCPD detectives. Having considered this evidence, as well as the totality of the circumstances surrounding the defendant's proffer of each post-arrest statement, the Court concludes that the government has met its burden as to the defendant's post-arrest statements, and the motion to suppress those statements is, accordingly, denied.

## 1. The Defendant's English Competency

Although the defendant argues that "he was not competent to be questioned in English regarding serious legal issues and waivers of his rights" (Def.'s Mem. of Law in Supp. of Mot. to Suppress ("Def.'s Mot.") at 5), the overwhelming evidence indicates that the defendant does, in fact, have a reasonably good command of the English language.[6] Thus, as discussed in detail below, the Court finds that, despite his

allegation to the contrary, the defendant was able to be questioned, to communicate, and to knowingly and voluntarily waive his *Miranda* rights in English. Accordingly, the defendant's motion to suppress on this ground is without merit.

Each of the detectives that took a statement from the defendant credibly testified about the defendant's English capabilities. Detective Reilly explicitly asked the defendant if he spoke English, and the defendant responded in the affirmative. (Tr. 12:6-14, 18:14-18.)[7] The other detectives similarly testified about the defendant's ability to communicate effectively in English. For example, Detective Ziegler testified that he and the defendant had no trouble understanding each other throughout an entire interview conducted in English (*id.* 190:11-17), Detective Michelis testified that the defendant was able to communicate fine in English and that there "was no issue surrounding his understanding of what [they] were saying or what he was saying" (*id.* 115:16-18), Detective Caputo testified that he felt confident that the defendant could understand him when he spoke in

---

[6] During the suppression hearing, the defense elicited testimony that the defendant was born in Honduras, a Spanish-speaking country, and that he left for the United States when he was approximately seven years old. (Tr. 118:12-119:7.) The defendant attended High School in Brentwood, New York, where he was placed in English as a Second Language ("ESL") classes. (*Id.* 252:24-25.) The defense argues that these facts demonstrate that the defendant is not competent to withstand questioning in English, but the Court disagrees. Based on the overwhelming evidence that the defendant was able to communicate effectively with multiple detectives in English, the Court concludes that, even if defendant's primary language is Spanish (or even if his preferred language is Spanish), he had a sufficient command of English to be questioned and to waive his rights in the English language.

[7] Detective Reilly also asked the defendant if he could read in English, and the defendant said that he could. (*Id.* 66:7-10.) Detective Caputo also testified that when he asked the defendant to read the last line of the English statement out loud, the defendant was able to do so competently. (*Id.* 134:17-24.) Even assuming *arguendo* that the defendant was not entirely comfortable reading English, based on the overwhelming evidence discussed both *infra* and *supra* of the defendant's ability to converse in English, it is clear that he could understand all the words that were read to him from the documents, as well as all the words that were said to him during the course of the interviews. (*See id.* 86:16-25 (Detective Reilly testifying that the defendant indicated that he was more comfortable speaking in English than reading the language, and that the defendant had no problem understanding Detective Reilly when he spoke in English).)

English and that he could understand the defendant when the defendant spoke in English (*id.* 136:8-17), and Detective Mancusi testified that the defendant did not appear to have any problems understanding him when he spoke in English (*id.* 173:2-7). There is also no indication that any of the questions asked by the detectives during the course of the interviews went unanswered; the evidence adduced at the hearing demonstrates that the defendant was able to understand each English question that was posed to him, and that he answered, in English, in an appropriate fashion. Moreover, other than the defendant's statement that he asked for someone to interpret for him (Juvenile Male Aff. ¶ 7), which the Court does not find to be credible, there is simply no evidence that the defendant ever requested a Spanish interpreter and that the request was denied. In fact, Detective Reilly credibly testified that the defendant never requested the aid of a Spanish interpreter at any point during his interview. (Tr. 87:22-24.)

Moreover, the detectives testified that the defendant corrected factual mistakes in the English statements. For example, Detective Reilly read the statement about the Health Mart robbery out loud to the defendant and asked the defendant to sign off on any corrections (*id.* 31:14-32:25), which the defendant did (Ex. 3). Detective Caputo also testified that he intentionally made some mistakes when he took the defendant's statement about the Off The Track Quick Mart robbery, to make sure that the defendant was reading along and could point out the errors (*id.* 133:8-9), which he was able to do (Ex. 10). The fact that the defendant was repeatedly able to flag errors contained within English statements further leads the Court to conclude that he is, in fact, competent in English.

The additional evidence of the defendant's English comprehension is abundant.[8] The defendant was able to write out descriptions of the figures and scenes contained in the still photographs created from video surveillance tapes. (*See* Exs. 7-9, 11, 13.) He was also able to write out English descriptions of the landmarks depicted in the map he drew for Detective Mancusi to show where the safe from the Chapi Deli robbery was hidden. (*See* Ex. 14.) In addition, Detective Reilly testified that Detective Michelis left to collect surveillance tapes from a McDonald's in North Babylon after the defendant told them that he had been at that McDonald's on the night of the Health Mart robbery. (Tr. 25:12-25.) As the government points out, because both detectives do not speak Spanish, the defendant had to deliver this alibi story in English competently enough to direct Detective Michelis to the precise location. (*See* Gov't Letter dated June 28, 2012, at 3.) Moreover, it is undisputed that each of the Detectives read the defendant his *Miranda* rights in English before they took statements from him, and that the defendant was able to waive those rights in English each time. (*See* Exs. 1, 3-6, 10, 12, 17.)

To the extent that the defendant argues that his degree of English competency prevented him from waiving his *Miranda* rights in a knowing and voluntary fashion, as is required under the law, *see Miranda*,

---

[8] The Court also notes that, although a doctor who speaks Spanish translated when necessary during the defendant's April 26, 2013 forensic psychological evaluation, the report from the psychological evaluation notes that the assessment was conducted primarily in English. (*See* Ex. A ("[The defendant] was interviewed on April 26, 2013, at the Suffolk County Jail in Riverhead, Long Island, N.Y. for approximately 1 hour and 30 minutes. The interview was conducted primarily in English. Dr. Barber also questioned him in Spanish whenever there was concern that he might not understand.").)

384 U.S. at 444, for all of the previously discussed reasons, the Court finds the defendant's argument that he lacks English competency to be meritless. Moreover, although a language barrier is a factor to consider in determining the validity of a waiver, *see, e.g.*, *Santiago*, 720 F. Supp. 2d at 252 (citing *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.")), the determination of validity "is not difficult when the suspect is advised of his rights in a language that he understands," *id.*; *see also United States v. Rijo-Carrion*, 11-CR-784 (RRM), 2012 U.S. Dist. LEXIS 179623, at *13 (E.D.N.Y. Dec. 19, 2012) ("When the suspect is advised of his rights in a language that he understands, the waiver determination is not difficult as it would be, for example, if a non-English speaking defendant were administered *Miranda* warnings in English." (citation and internal quotation marks omitted)). As discussed *infra*, the credible and overwhelming evidence in the record indicates that the defendant was advised of his rights in a language that he understands, English.[9] Thus, the fact that the defendant was not informed of his rights in Spanish (even if

that is the language he prefers or is more comfortable with) does not negate the validity of what were otherwise knowing, intelligent, and voluntary waivers of defendant's *Miranda* rights. *See, e.g.*, *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (finding that defendant gave knowing and voluntary waiver of his rights where he had "a reasonably good command of the English language"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (holding that a defendant with "limited" English proficiency nonetheless made a valid *Miranda* waiver); *United States v. Rom*, No. 2:10-CR-146, 2011 U.S. Dist. LEXIS 126524, at *12 (D. Vt. Nov. 1, 2011) ("[A]ny limited language barrier possessed by Defendant does not appear to have prevented Defendant from making the waiver with full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." (citation and internal quotation marks omitted)).

In sum, all of the evidence in the record establishes that the defendant has a reasonably good command of the English language. The government has proven, by a preponderance of the evidence, that the defendant's English-language skills were sufficient to enable him to (1) knowingly, intelligently, and voluntarily waive his *Miranda* rights in English; (2) to be questioned in English; and (3) to sign off on statements that had been taken in English. Thus, the defendant's motion to suppress the post-arrest statements on the ground that he is not competent in English is without merit.

2. The Defendant's Post-Arrest Statements Were Not the Product of Coercion

The defendant claims that, when he initially refused to answer questions in the interview room of the Third Precinct, he was

---

[9] Moreover, each detective testified that he went through the *Miranda* rights and waivers line by line with the defendant, making sure that the defendant understood each line that was read to him before moving on to the next (obtaining his verbal affirmation, as well as his written initials). (*See, e.g.*, *id.* 129:9-131:21 (Detective Caputo testifying about the process by which he informed the defendant of his rights and obtained the defendant's waiver of those rights).) There is simply no indication in the record that the defendant, at any point during any of the various interviews, complained of being unable to understand or appeared to not comprehend the words that were being read to him.

yelled at, threatened, and punched in the face while handcuffed to a desk. (Juvenile Male Aff. ¶ 4.) The defendant also claims that he heard one of his friends (who was also in custody for questioning) screaming in pain, and that he witnessed another friend with a broken nose and a swollen face. (*Id.*). The defendant further asserts that he began to answer Detective Reilly's questions at that point in time because he was "afraid." (*Id.*) In response to the defendant's argument that his statements should be suppressed because coercive tactics were employed to obtain them, the government offered the testimony of six SCPD detectives, all of whom testified that they did not physically threaten or assault the defendant. In light of all of the evidence in the record, the Court finds the defendant's version of events to be not credible and the detectives' version of events to be wholly credible. Thus, having examined all of the circumstances attendant to each statement that was obtained from the defendant, as well as the detectives' version of events that the Court finds to be fully credible, the Court concludes that the government has met its burden of showing that the confessions were obtained voluntarily (and were not the product of coercion or improper inducement), and the motion to suppress on this basis is meritless.

The focus of the defendant's coercion argument is the conduct of the detectives who took his post-arrest statements. However, aside from the defendant's self-serving statement that he was "threatened and was punched in the face" by police officers, the record is devoid of any evidence that the detectives physically coerced the defendant into making inculpatory statements. There is simply no credible evidence in the record that the defendant was physically forced into providing statements to officers while in

custody. Instead, each detective that took a statement from the defendant testified that the defendant was not physically threatened or assaulted in any way during the interviews (*see* Tr. 43:22-44:3 (Detective Reilly testifying that, during the course of his questioning, neither he nor Detective Michelis physically struck, assaulted, or threatened the defendant); *id.* 114:19-25 (similar testimony from Detective Michelis); *id.* 139:17-21 (similar testimony from Detective Caputo); *id.* 172:11-16 (similar testimony from Detective Mancusi); *id.* 190:18-20 (similar testimony from Detective Ziegler)), and the Court finds the detectives who testified to be credible. The government has, therefore, shown that no threatening statements were made and no physical force was exerted at any point during the interviews to pressure the defendant to confess. *See United States v. Awan*, 384 F. App'x 9, 14-15 (2d Cir. 2010) (affirming district court's finding that defendant's statements were voluntarily based on, *inter alia*, district court's finding that the government showed that no threatening statements were made during the interviews, and that the government investigators tried to maintain a friendly atmosphere).

Moreover, the evidence adduced at the suppression hearing indicates that none of the detectives who interviewed the defendant engaged in "repeated and prolonged . . . questioning" designed or intended to overcome the defendant's free will. *Green*, 850 F.2d at 902. There is no evidence that the interviews were anything other than calm, measured question and answer sessions. *See, e.g.*, *United States v. Peldomo*, 10-CR-0069 (RRM)(ALC), 2010 U.S. Dist. LEXIS 129051, at *7 (E.D.N.Y. Dec. 7, 2010). In fact, the defendant was read his *Miranda* rights when he first entered the interview room at the Third Precinct, and he was re-read his rights

before each statement was taken. As noted *infra*, the Court finds that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights each time that they were read to him, a fact that is "highly probative" of voluntariness. *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012); *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) (explaining that it is "rare" for a defendant to be able to make a colorable argument that a self-incriminating statement was "compelled" in situations where law enforcement authorities "adhered to the dictates of *Miranda*").

In addition, there is credible evidence that the defendant was taken to the bathroom at multiple points while he was in custody (*see* Tr. 43:3-6 (Detective Reilly describing SCPD Prisoner Activity Log entries demonstrating that he took the defendant to the bathroom during the February 28, 2012 questioning); *id.* 116:13-22 (Detective Michelis describing SCPD Prisoner Activity Log entry demonstrating that he took the defendant to the bathroom during the interview)), that he was given the opportunity to eat or drink (*see id.* 42:14-23 (Detective Reilly describing SCPD Prisoner Activity Log entries demonstrating that the defendant was given water during his February 28, 2012 questioning); *id.* 242:19-23 (Detective McLeer testifying that he got the defendant crackers or chips and either a soda or Gatorade)), and that his handcuffs were periodically removed (*see id.* 43:17-21 (Detective Reilly testifying that the defendant's handcuffs were removed while he was read his *Miranda* rights); *id.* 62:9-11 (Detective Reilly testifying that, upon entering the interview room, he uncuffed one of the defendant's hands and loosened the other)). There was also nothing unusual about the interview room in which the defendant was questioned to suggest that the location itself was somehow inherently coercive. Multiple detectives also explicitly testified that, during their time with the defendant, he never once asked for a lawyer. (*See id.* 139:22-24; *id.* 172:17-19.) Based on all of these facts, it is clear that the defendant was neither "questioned in a hostile environment nor . . . subjected to rigorous interrogation." *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987).[10]

_____

[10] As to the length of defendant's detention, the Court notes, as a threshold matter, that although the defendant remained in the Third Precinct interview room for many hours, the length of each of his individual interviews does not give rise to any presumption of coercion, *see, e.g.*, *Green*, 850 F.2d at 902 (finding duration of interrogation not to be coercive where interview lasted "for just over two hours"); *Guarno*, 819 F.2d at 31 (finding duration of interview not to be coercive when it lasted for approximately two and a half hours), and there is no evidence that the defendant asked for a break and was not granted one. Moreover, there is nothing inherently coercive about the overall duration of the defendant's interrogation. *See, e.g.*, *Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir. 2008) (finding that seventeen-year-old defendant's written confession was voluntarily made when he was subjected to noncontinuous interrogation while in custody for forty hours prior to signing his statement); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494-95 (9th Cir. 1997) (finding that the petitioner failed to establish that his confession was the product of coercion when "he had been detained since 12:15 a.m. and was not questioned until 9:30 a.m."); *Vance v. Bordenkircher*, 692 F.2d 978, 981-82 (4th Cir. 1982) (finding that fifteen-year-old defendant with moderate mental deficiency confessed voluntarily when he was subjected to intermittent interrogation over a period of approximately nine hours because he was read his *Miranda* rights, was given food, was not threatened or tricked by police officers, and never asked for the questioning to cease); *United States v. Bear Killer*, 534 F.2d 1253, 1256-57 (8th Cir. 1976) (finding in-custody statements to be voluntary when interviews were conducted over a twelve hour period between the defendant's arrest and his confession because, *inter alia*, the defendant was "advised of his rights under Miranda before each interrogation, he was aware of the nature of the offense under investigation, he was denied neither sleep nor food, and the questioning was neither of an oppressive nor

The Court has also considered, as it must, the relevant characteristics of the defendant – his experience, background, youth, and education or intelligence. *See Green*, 850 F.2d at 902. Although the defendant was a juvenile at the time of the interrogation, he was of an age where he could understand and appreciate the effects of his actions. The defendant has received a High School education up until tenth grade, has held a job (*see* Tr. 240:3-6 (Detective McLeer testifying that the defendant "indicated that he worked at a 7-Eleven on Bay Shore Road")), and he has been living in this Country since he was seven years old. In addition, there is no evidence that the defendant suffers from any sort of mental disability, or that he was under the influence of any mind-altering substances at the time of his arrest. Instead, the record before the Court demonstrates that the defendant was responsive and alert throughout the interviews. The Court finds, therefore, that none of the defendant's characteristics support a finding that any of his six statements were involuntary made.[11]

Thus, under the "totality of the circumstances" test, the Court concludes that the defendant's statements were neither improperly induced nor obtained by means of physical violence, but, rather, were completely voluntary. Accordingly, the motion to suppress on the basis of improper coercion is denied. *See, e.g.*, *United States v. Rubio*, 709 F.2d 146, 153 (2d Cir. 1983) (affirming district court's denial of motion to suppress based on district judge's findings that, *inter alia*, "there was no credible evidence that [the defendant] was coerced into making any statements through physical or mental abuse" (internal citations and quotation marks omitted)).

\*\*\*

In sum, based on the credible testimony at the suppression hearing and all of the evidence in the record, the Court concludes that (1) the defendant is competent in English (so much so as to waive his rights and answer questions in the language), and (2) none of the defendant's post-arrest statements were involuntarily made or were the product of coercion. In short, the government has met its burden of proving, by a preponderance of the evidence, that each of the defendant's post-arrest

---

a harassing nature"); *United States v. Jacques*, 784 F. Supp. 2d 48, 54 (D. Mass. 2011) (finding the defendant's confession to be voluntary when he was subjected to questioning by law enforcement officers "over a time period lasting more than six-and-one-half hours"). Instead, the length of the defendant's interrogation is but one piece of a much larger "totality of the circumstances" analysis that alone is not dispositive of whether the defendant's statements to the SCPD detectives were voluntary. *See, e.g.*, *United States v. Hill*, 2:12cr21-WKW, 2013 U.S. Dist. LEXIS 82467, at \*28 (M.D.Ala. Feb. 22, 2013). Notwithstanding the hours of interviews that occurred, as discussed *infra*, there is no indication that the length impacted the voluntariness of the defendant's statements. Instead, based on the evidence adduced at the hearing, the Court finds that none of the detectives who interviewed the defendant acted inappropriately in any manner, and there is no doubt that the defendant was willingly cooperating with each detective that entered the interview room. Moreover, the defendant was given food, drink, and bathroom breaks. In addition, he never indicated or appeared to be tired, nor did he ask that any interview stop because he was tired or for any other reason. In short, there is no evidence that the combined length of all of the interviews transformed any particular interview into a coercive environment; rather, the evidence demonstrates that the defendant continued to waive his rights and give statements throughout the duration of his interrogation in a knowing, voluntary, and intelligent manner.

[11] The Court has also considered the report from the defendant's April 26, 2013 forensic psychological evaluation. (*See* Ex. A.) Nothing in the report alters the Court's conclusion that the defendant's characteristics fail to support a finding that any of his statements were involuntary made.

statements should be admissible, and the motion to suppress defendant's post-arrest statements is denied.

## B. Evidence Obtained During the February 29, 2012 Search of the Defendant's Home

The defense argues that the evidence obtained during the February 29, 2012 search of the defendant's home should be suppressed because the search was conducted pursuant to a warrant that issued without the requisite probable cause. The defendant's central argument offered to dispute the validity of the search warrant is that Detective Reilly lied and misrepresented the true use and intent of the Consent to Search form that he provided to the defendant in order to convince the defendant to sign it. The defendant contends that his consent to search was, therefore, improperly obtained, and that, without that consent, there was not enough information to establish probable cause for the issuance of a warrant. For the reasons discussed in detail below, the Court finds that the defendant's consent to search was offered knowingly and voluntarily, and was not improperly obtained. In any event, the existence of the signed Consent to Search form (which was attached to the warrant affidavit) had no impact on the probable cause determination. Instead, this Court finds that, independent of the valid consent, the magistrate judge who signed the search warrant properly determined that probable cause for the warrant existed. Accordingly, the defendant's motion to suppress the evidence obtained during the February 29, 2012 search of his home is denied.

### 1. The Defendant's Consent to Search Was Voluntary

The Court first discusses the validity of the consent provided by the defendant for the search of his home.

#### a. Applicable Law

When the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The government must prove voluntariness by a preponderance of the evidence. *See id.*; *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

Whether consent was voluntarily given is "a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). The "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (citation and internal quotation marks omitted). The standard for evaluating a subject's consent is "'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations omitted).

In assessing the "totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation" – the Supreme Court has considered various factors. *Schneckloth*, 412 U.S. at 226. For example, some of these factors include "the youth of the accused; his lack of education; or his low intelligence,

the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as deprivation of food or sleep." *Id.* (internal citations omitted). In each case, the Supreme Court's decision "reflected a careful scrutiny of all the surrounding circumstances," as opposed to "the presence or absence of a single controlling criterion." *Id.* For example, "'the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search.'" *United States v. Tortorello*, 533 F.2d 809, 814 (2d Cir. 1976) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)).

Courts have also considered relevant factors such as "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent." *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (footnotes omitted). In addition, the government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness. *See United States v. Drayton*, 536 U.S. 194, 206-07 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." (citations omitted)); *see also Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.")

b. Analysis

Applying the above-referenced standard to the facts of this case, the Court concludes that the defendant voluntarily consented to the search of his home. As discussed below, the surrounding totality of the circumstances, including the details of the interview and the characteristics of the defendant, make clear that the consent to search by the defendant was voluntary.

Detective Reilly testified that the defendant voluntarily provided verbal consent for a search of his home, as well as written consent when he signed the Consent to Search form, during his interview. (Tr. 19:10-16; Ex. 2.) Based on Detective Reilly's credible testimony, it is clear that the defendant was informed of his *Miranda* rights, and waived those rights, prior to providing his verbal and written consent to search. Detective Reilly also testified that he read the Consent to Search form to the defendant, explained the wording of the form, and gave the defendant an opportunity to examine the document before asking the defendant to sign it. (Tr. 20:16-21:16; 70:7-15.) The Consent to Search form explicitly informed the defendant of his right to refuse consent to the search. (*See* Ex. 15.) Detective Reilly also explained to the defendant that, by signing the form, he was giving the SCPD permission to search *both* his room and his house. (Tr. 71:1-4.) Detective Reilly further informed the defendant that, by signing the form, the defendant was agreeing that anything found during the search could be used against the defendant in a court of law. (*Id.* 75:14-76:5.) After receiving all of this information, the defendant proceeded to sign the Consent to Search form at approximately 11:52 p.m. on February 28, 2012. (*Id.* 21:17-25.)

Nonetheless, the defendant contends that he was never informed of his constitutional rights regarding police searches, and that the Consent to Search was never read to him before he was asked to sign it. (Juvenile Male Aff. ¶ 11.)[12] Because the Court deems Detective Reilly's testimony to be fully credible, and the defendant's version of events to be not credible, and because, as discussed *supra*, the Court finds that the interviews (during which the defendant's consent was obtained) were non-coercive and that the defendant's characteristics do not support a finding of involuntariness, the Court finds that the defendant's consent to search was, in fact, knowingly, voluntarily, and intelligently given (and was not the product of coercion or improper inducement).

## 2. The Valid Search Warrant

Even independent of the knowing and voluntary consent that the defendant provided for the search of his home, the Court finds that the search was conducted pursuant to a valid warrant based upon probable cause.

The Court preliminarily notes that, because a neutral magistrate judge signed the search warrant (*see* Ex. 15), probable

cause for the search that ultimately occurred is presumed to exist. *See Leon*, 468 U.S. at 914. As the Supreme Court has instructed, although this Court is to accord "great deference" to the magistrate judge's finding of probable cause, it may invalidate the warrant if it finds that the magistrate judge improperly determined that probable cause for the issuance of the warrant existed. *Id.* at 914-15. In this case, however, the Court sees absolutely no reason to disturb the magistrate judge's finding of probable cause. Based on the totality of the circumstances prior to the issuance of the warrant – namely, *inter alia*, the portions of the defendant's post-arrest statements where he confessed to hiding masks and weapons used during the commission of the robberies in question in his house, as well as sworn statements of employees of the Health Mart that was robbed – the Court finds that there was "a fair probability that [the defendant's] premises [would] yield the objects specified in the search warrant," so as to establish probable cause for its issuance. *Travisano*, 724 F.2d at 345. Accordingly, the Court finds that the magistrate's probable cause determination, based on the affidavit submitted in support of the search warrant, was not at all improper or misinformed, and that the search warrant that issued is valid.

## 3. Good Faith for the Search

Even if probable cause for the search did not exist, the Court concludes that, based on the circumstances of this case, evidence seized pursuant to the search warrant should not be suppressed. The Court finds that the detectives had an objectively reasonable belief that their search of the defendant's home was constitutional under the Fourth Amendment.[13] There is no evidence that the

---

[12] In addition, the defense claims that the "Consent to Search form signed by the defendant [] was clearly taken after Detective Reilly lied and misrepresented the true use and intent of the document." (Def.'s Mot. at 8.) However, there is simply no evidence in the record to support this conclusory allegation; no evidence was produced during the suppression hearing, nor was any testimony elicited, tending to even remotely support this allegation. Instead, the evidence presented by the government leads the Court to conclude that the defendant knowingly and voluntarily consented to the search of his house after the true purpose and intent of the form – and the implications of the defendant signing that form – were thoroughly explained to the defendant.

[13] This finding was made largely for the same reasons that the Court concluded that the affidavit submitted

detectives' reliance on the search warrant was unreasonable or not in good faith. Thus, excluding the evidence obtained from the search would not further the purpose of the exclusionary rule – to deter unlawful police conduct. *Leon*, 468 U.S. at 919-20; *see also Muhammad*, 2013 U.S. App. LEXIS 7201, at *16 ("Even if the affidavit in support of the warrant had not established probable cause, the District Court would not have erred in declining to suppress the evidence because the officers who obtained the warrant acted 'with objective good faith.'" (quoting *Leon*, 468 U.S. at 920)). Accordingly, the evidence obtained during the February 29, 2012 search should not be suppressed even assuming *arguendo* that probable cause for the issuance of the warrant was deemed not to exist.

*\*\*\**

For all of these reasons, the Court concludes that the evidence obtained from the defendant's home during the search conducted pursuant to the warrant should not be suppressed. Accordingly, the motion to exclude such evidence is denied.

### III. CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 12, 2013
        Central Islip, New York

*\*\*\**

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 by John J. Durham, Assistant U.S. Attorney. The defendant is represented by Richard A. Miller, Miller & Skubik LLP, 356 Veterans Memorial Highway, Suite 3, Commack, NY 11725.

---

in support of the warrant created probable cause for the search. *See, e.g.*, *United States v. Muhammad*, Nos. 12-206-cr(L), 12-208-cr(con), 12-259-cr(con), 2013 U.S. App. LEXIS 7201, at *16 (2d Cir. Apr. 10, 2013) ("For the same reasons we conclude that the affidavit provided probable cause, we conclude that the warrant application was not 'so lacking in indicia of probable cause as to render reliance upon it unreasonable.'" (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992))).