UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

No 12-CR-594 (JFB)
_____

UNITED STATES OF AMERICA,

VERSUS

JUVENILE MALE,

Defendant.
_____

**MEMORANDUM AND ORDER**
September 11, 2013
_____

JOSEPH F. BIANCO, District Judge:

On September 18, 2012, the government filed a Juvenile Information against defendant Juvenile Male[1] ("Juvenile Male" or "the defendant"), an alleged member of the La Mara Salvatrucha ("MS-13") street gang, charging him with one count of conspiracy to commit Hobbs Act Robbery, 18 U.S.C. § 1951(a); six counts of Hobbs Act Robbery, 18 U.S.C. § 1951(a); and five counts of brandishing firearms during the commission of a crime of violence and one count of brandishing and discharging firearms during the commission of a crime of violence, 18 U.S.C. § 924(c). Specifically, the defendant's charges arise from his alleged involvement in a series of armed robberies that took place between December 2011 and February 28, 2012: the Health Mart robbery that occurred on February 28, 2012; the Mi Tierrita Restaurant robbery that occurred on February 12, 2012; the Iglesia Church robbery that occurred on January 11, 2012; the Lempa Delicatessen robbery that occurred on January 4, 2012; the Off The Track Quick Mart robbery that occurred on January 6, 2012; and the Chapi Delicatessen robbery that occurred on January 26, 2012.

On March 15, 2013, the defendant moved to suppress statements he made to law enforcement officers after his arrest on February 28, 2012 and evidence that was seized from his home on February 29, 2012. After conducting a full evidentiary hearing (including an evaluation of the demeanor of the testifying witnesses), this Court concluded that defendant's arguments for

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

suppression of his post-arrest statements and evidence seized from his home were without merit. Accordingly, on July 12, 2013, this Court denied the motion to suppress in its entirety.

The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. By letter dated July 23, 2013, counsel for defendant requested that the Court consider the psychological report of the defendant submitted by two licensed psychologists, and the Court has considered that report. On September 6, 2013, the Court also held a transfer hearing.

This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032. For the reasons set forth herein, the Court finds that transfer of this case to district court for prosecution of the defendant as an adult is warranted in the interest of justice. More specifically, as discussed in great detail below, after carefully considering the record and analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

Applying the statutory factors, it is clear that transfer to adult status is warranted in this case. First, the nature of the alleged offenses – six armed robberies (during which innocent victims were allegedly, at times, held at gunpoint, pushed to the ground, and sexually assaulted) – overwhelmingly favors, in the interest of justice, transferring the case to district court so that the defendant can be prosecuted as an adult. Moreover, these crimes are alleged to have been committed as part of the defendant's participation in the racketeering activity of the violent "MS-13" street gang. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile justice system, including the limited sentencing options available in that system if the defendant is found guilty (for example, the statutory maximum of five years' incarceration the defendant could receive), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these grave charges when considered in conjunction with the other statutory factors. Second, with respect to the statutory factor regarding the age and social background of the defendant, he allegedly committed all of the armed robberies with which he is charged between the ages of 17 years and 6 months and 17 years and 8 months. The defendant is now 19 years old. Despite the defendant's family's efforts to shield him from gang activity, the Juvenile Information's allegations, as well as the findings contained within the psychological report created by Dr. L. Thomas Kucharski ("Dr. Kucharski") and Dr. Virginia Barber-Riojas ("Dr. Barber-Riojas"), suggest that the defendant still turned to the violent activity of the MS-13. Although the defendant was under the age of 18 when he allegedly committed the armed robberies charged, the fact that all of the crimes occurred just a few months shy of the defendant's 18th birthday, coupled with the fact that the defendant is currently 19 years of age and chose the MS-13 over the family structure that was available to him, weighs in favor of transfer in this case. The third factor in the transfer analysis weighs against transfer, as the defendant has no prior convictions. The fourth factor, the defendant's present intellectual development and psychological maturity, favors transfer of the defendant to adult status. Specifically, Dr. Kucharski and Dr. Barber-Riojas

2

reported that defendant's thoughts were "logical, rational, and coherent," he exhibited "no symptoms of mania," his "attention, memory, and concentration were within normal limits," and that he "appears to be psychologically devoid of any significant deficits in maturity." (Forensic Psychological Evaluation of Dr. Kucharski & Dr. Barber-Riojas, May 20, 2013 ("Kucharski & Barber-Riojas") at 3-4.) They also noted that the defendant "harbor[s] a mindset that is pro-criminal in nature" and possesses "several antisocial personality traits." (*Id.* at 5.) These findings indicate that the defendant has the requisite maturity to be treated as an adult in this case, and that his criminal mindset is of the type that is unlikely to change within a short period of time. The fifth factor is neutral, as there is no evidence that past treatment efforts have been made with respect to the defendant. Finally, although the sixth factor weighs against transfer, given the apparent availability of out-of-state juvenile facilities that would have programs designed to treat the defendant's behavioral problems, this factor (and his lack of a criminal record) does not outweigh the other factors. In particular, the serious and violent nature of the alleged offenses – coupled with the defendant's age, social background, intellectual development, and psychological maturity – overwhelmingly favors transfer.

The Court also notes that, based on the findings of Dr. Kucharski and Dr. Barner-Riojas, the defendant "[does] not appear to appreciate the fear that he induced in the individuals he robbed at gunpoint," and he "externalize[s] responsibility for his actions, blaming gangs who had hurt or even killed MS-13 members." (*Id.* at 3.) Moreover, the defendant is alleged to have a long-standing affiliation with the MS-13. Given that the defendant has apparently failed to express remorse for his alleged criminal conduct and/or a desire or willingness to change his lifestyle, coupled with the fact that the defendant has associated with the gang and its violent activities for quite some time, the Court finds it highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged. In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined that the interest of justice would be served by treating the defendant as an adult in this case.

I. THE CHARGES[2]

The charges against the defendant stem from his alleged involvement in MS-13, a criminal enterprise based in El Salvador and operating in the United States, including on Long Island and in Queens. (Gov't's Mem. of Law in Supp. of Transfer Mot. ("Gov't's Mem. of Law") at 2, 4.) On Long Island, MS-13 is alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.* at 2-3.) Twenty-seven defendants allegedly associated with MS-13 were charged with

---

[2] The allegations set forth herein were drawn from the government's motion papers and supporting documentation, including the Juvenile Information. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995) ("*Nelson I*"). Accordingly, the Court merely sets forth the allegations and the nature of the offense as set forth by the government and takes no position as to the relative strength of the evidence supporting those allegations.

3

various crimes in a 70-count superseding indictment filed on March 3, 2011 in *United States v. Prado*, No. 10-CR-074 (JFB). Another 14 defendants allegedly associated with MS-13 were charged with various crimes, including some of the same crimes charged here, in a 61-count superseding indictment filed on April 4, 2013 in *United States v. Alvarenga*, No. 12-CR-063 (JFB).

As set forth in the government's transfer motion, the defendant has been charged in connection with a series of armed robberies that took place between January 4, 2012 and February 28, 2012. (*Id.* at 3.) The defendant has been charged with six separate charges of Hobbs Act Robbery, conspiracy to commit Hobbs Act Robbery, and various charges of brandishing and discharging firearms during the commission of crimes of violence. (*Id.*)

According to the allegations in the government's submissions, the defendant was part of an armed robbery crew within the MS-13 that committed at least seven armed robberies in Suffolk County, New York, between January 4, 2012 and February 28, 2012. (*Id.* at 6.) The government alleges that the defendant participated in six specific armed robberies with this group. Set forth below is a summary of the government's proffered evidence with respect to each robbery charged.

The first occurred at the Lempa Deli in Brentwood, New York, on January 4, 2012. (*Id.*) Defendant was one of the gunmen who entered the deli (along with another gunman and a third man who was armed with a knife), placed his weapon against the head of a victim, and threatened to kill the victim if he or she failed to cooperate. (*Id.*) The group of robbers obtained keys to both the register and the safe, and stole approximately $4,000, which they split evenly. (*Id.* at 7.) This course of events was captured by the deli's video surveillance cameras. (*Id.*) The second robbery occurred at the Off the Track Quick Mart in Babylon, New York, on January 6, 2012. (*Id.* at 8.) Defendant served as the driver; he remained in the car during the commission of the robbery and communicated with the other robbers to coordinate their escape. (*Id.*) The third robbery took place at the Iglesia Universal Church in Brentwood, New York, on January 11, 2012. (*Id.*) Defendant entered the church wearing a mask and carrying a gun, accompanied by two other members from the robbery crew. (*Id.* at 8-9.) Defendant and his friends put a gun to the minister's head, and then proceeded to steal the church's collection box, computers, and cameras. (*Id.*)

The fourth robbery took place on January 26, 2012, at the Chapi Deli in Huntington, New York. (*Id.* at 9.) Defendant and his friends were armed when they entered the deli; they brandished their weapons, forced workers into the back room and onto the floor while they took the workers' wallets and phones, and then stole the deli's safe (which contained approximately $10,000). (*Id.* at 9-10.) The fifth robbery took place at the Mi Tierrita Restaurant in Brentwood, New York, on February 12, 2012. (*Id.* at 10.) Defendant and two friends entered the restaurant through a rear door wearing masks and carrying guns. (*Id.*) Workers who attempted to flee the scene were chased, thrown down to the ground, and were "repeatedly hit and threatened by the gunmen." (*Id.*) Two of the waitresses were sexually assaulted while being forced to lay on the floor. (*Id.* at 11.) Because none of the workers had the combination to the safe, the gunmen could not reach that money. However, they fled the scene with approximately $3,500 in

4

restaurant proceeds, tips, and money from the workers. (*Id.*) The final robbery that defendant is charged with occurred on February 28, 2012, at the Health Mart Pharmacy in North Bay Shore, New York. (*Id.*) Defendant allegedly remained in the car while three of his friends entered the pharmacy with handguns. (*Id.*) His three friends took employees of the pharmacy "to the back of the store where they tied three of them up with white plastic zip ties, while trying to force the fourth to open the safe." (*Id.*) They stole approximately $10,000 from the pharmacy, as well as the store's surveillance tape, before fleeing to defendant's car. (*Id.* at 12.)

Defendant provided the Suffolk County Police Department ("SCPD") with written statements confessing to each of the six robberies discussed above. By Memorandum and Order dated September 6, 2013, this Court denied defendant's motion to suppress those statements.

II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *Nelson I*, 68 F.3d at 588 (quoting 18 U.S.C. § 5032).[3] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish, by a preponderance of the evidence, that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in Section 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. Furthermore, the defendant's potential for rehabilitation typically should also be given "special

---

[3] In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Juvenile Certification, Sept. 6, 2012, ECF No. 36.)

5

emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal citation and quotation marks omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal citations and quotation marks omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[4]

III. ANALYSIS OF FACTORS

A. Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing; noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion" and that "[t]he statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application"). The closer the juvenile is to the age of majority, the greater this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal citation and quotation marks omitted)).

In this case, the defendant was approximately 17 years and 6 months old at the time of the first robbery, and

---

[4] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir.

1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

approximately 17 years and 8 months old at the time of the most recent robbery charged. Defendant was approximately 19 years and 2 months old at the time of the transfer hearing.

The Court finds that with respect to the crimes under consideration, the defendant's age at the time of the offense weighs in favor of transfer because the defendant is alleged to have participated in a series of gang-related robberies and acts of violence beginning at the age of 17 years and six months, just six months short of turning 18. Defendant's alleged continued participation in violent robberies up to just a few months before his 18th birthday supports all of these charges being transferred to adult status. *See United States v. Doe,* 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16 ½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *see also United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) (stating that several courts have concluded "that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult" (internal citations omitted)); *United States v. C.P.A.*, 572 F. Supp. 2d 1122, 1126 (D.N.D. 2008) (defendant's age of 17 years 8 months at time of offense and age of 18 at the time of hearing favored transfer); *United States v. H.V.T.*, No. 96–cr–244, 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer.").

The defendant's current age also weighs in favor of transfer. Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of 19 years and 2 months, which would allow him only five years[5] in a juvenile detention facility to rehabilitate himself, weighs in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal citations and quotation marks omitted)); *Juvenile Male*, 554 F.3d at 468-69 ("[W]e agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21.").

---

[5] *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend . . . in the case of a juvenile who is between eighteen and twenty-one years old (A) who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of (i) five years or (ii) the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant . . . .").

7

The Court finds that the defendant's social background also weighs in favor of transfer. The defendant was born in Honduras. He was raised by both of his parents until the age of 3, when his mother moved to Guatemala to escape the violence and abuse she received from her husband. (Kucharski & Barber-Riojas at 2.) At that point in time, the defendant moved in with his grandparents in Honduras. (*Id.*) His mother moved to the United States two years after leaving Honduras for Guatemala, and the defendant only saw his father approximately once a year. (*Id.*) The defendant told Dr. Kucharski and Dr. Barner-Riojas that he had a good relationship with his grandparents, and that they took good care of him. He denies any history of physical or sexual abuse or witnessing any significant violence during his years living with his grandparents in Honduras or after coming to the United States. (*Id.*)

The defendant left Honduras at age 10 with his uncle's girlfriend and a cousin. (*Id.*) He had completed the fifth grade in Honduras before leaving. (*Id.*) The defendant crossed the border into the United States; his stepfather took him to Long Island to live with his mother and two half-sisters (who were 4 and 2 years of age at the time). (*Id.*) Although the defendant indicated that he was not very close with his stepfather, he told Dr. Kucharski and Dr. Barner-Riojas that they always had a "good relationship" and were "polite with each other." (*Id.*)

Upon entering the United States, the defendant began sixth grade. (*Id.*) He started cutting classes to spend time with his friends and, as a result, failed two grades twice and was suspended approximately 10 times for truancy and once for fighting. (*Id.*) At age 14, the defendant started smoking marijuana daily. (*Id.* at 3.) He was expelled from school at age 17, and claims that he was falsely accused of sending someone to hurt a fellow student as part of gang activity. (*Id.* at 2.) After being expelled from school, the defendant worked for six months at a swimming pool factory and then for three or four months at a 7-Eleven. (*Id.*)

At age 15, defendant began a serious relationship with a woman. After a year of dating, she became pregnant. (*Id.* at 3.) They currently have a daughter who is 1 year and 6 months old. (*Id.*) The defendant and the woman never moved in together, but the defendant told Dr. Kucharski and Dr. Barner-Riojas that he sees the woman and his daughter about twice a week, and that he used to give them between $100 and $150 per month. (*Id.*) The defendant claims that he is still in a relationship with the woman, but that they rarely speak now. (*Id.*)

The defendant told Dr. Kucharski and Dr. Barner-Riojas that MS-13 gang activity in Honduras was one of the reasons his family sent him to live in the United States. (*Id.*) The first group of friends that approached the defendant after he came to live in the United States was MS-13 members. (*Id.*) According to the defendant, those friends "became like his family." (*Id.*) According to Dr. Kucharski and Dr. Barner-Riojas, the defendant externalizes responsibility for his actions – he blames other gangs who have ever hurt or killed MS-13 members for causing him to need to defend himself. (*Id.*)

The Court finds that defendant's social background weighs in favor of transfer because, although it appears that the defendant's home life may have been unstable prior to the age of 3, he had a family structure available to him in his grandparents and siblings in Honduras after

8

that point, as well as in his mother and stepfather once he moved to the United States. Indeed, according to the defendant, it was his family that made the decision to move him to the United States, at least one reason being to keep him away from the MS-13 and gang-related activity. Instead of taking advantage of his familial networks and avoiding a path to violence that his family worked to shield him from, the defendant became a member of a gang, *see H.V.T.*, 1997 WL 610767 at *4 ("It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home. . . . It also appears that H.V.T. became a member of a gang."), and has continued to associate with the gang for quite some time, *see Doe*, 49 F.3d at 867 (finding that district court did not abuse its discretion by concluding that defendant's social background was a factor weighing in favor of transfer due to defendant's "long association" with a violent gang).

Moreover, after conducting a psychological examination of the defendant, Dr. Kucharski and Dr. Barner-Riojas noted that the defendant "did not appear to appreciate the fear that he induced in the individuals he robbed at gunpoint" (Kucharski & Barner-Riojas at 3), and that he "externalized responsibility for his actions, blaming gangs who had hurt or even killed MS-13 members" (*id.*). Based on this assessment, the Court does not find that the defendant is remorseful for his actions, desiring to disassociate with the gang, or willing to rehabilitate himself. Even if the defendant expressed remorsefulness or a desire or willingness to put his life on a new track, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged.

In sum, the fact that the defendant was between 17 years and 6 months and 17 years and 8 months old during all of the robberies for which he is charged weighs in favor of transfer, as does defendant's current age and social background. Accordingly, the age and social background factor weighs in favor of transfer.[6] *See, e.g.*, *United States v. Juvenile (I.H., Jr.)*, 1 F. Supp. 2d 509, 518 (D.V.I. 1998) ("I.H.'s age at the time of the offenses [16 at time of carjacking and rape; 17 at time of robbery] and at the time of transfer [19] auger in favor of transferring him for prosecution as an adult. It must also be considered that his having come from a stable home and yet having done these terrible acts likewise weigh in favor of transfer.").

B. Nature of the Offense Alleged

As previously set forth, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must

---

[6] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for those reasons set forth herein. *See, e.g.*, *United States v. Jerry Paul C.*, 929 F. Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant to adult status where his age of 15 weighed against transfer, but other factors "tilt[ed] in favor of transfer").

9

assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Juvenile Information are serious and extremely violent. As discussed *supra*, the defendant is alleged to have participated in six armed robberies – robberies where, according to the government, innocent individuals were generally forced to the ground, threatened by the potential use of deadly weapons, and sexually assaulted in one instance. The defendant is also alleged to have discharged a firearm in connection with one of the robberies. Moreover, all of these armed robberies were allegedly committed as a part of the defendant's participation in the violent racketeering activity of the MS-13 gang.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See Nelson I*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors."). The crime of armed robbery is a very serious offense – it is the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crime charged was armed robbery. *See United States v. Robinson*, 404 F.3d 850, 859 (4th Cir. 2005) (noting that "the nature and severity of the crimes is the most important factor" in the transfer analysis and agreeing with "the district court's determination that the nature and severity of the alleged crimes weighed heavily in favor of a transfer" where the defendant was charged with nine armed robberies and with the discharging of a weapon during two of the robberies); *United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) ("[T]he [district] court's placing considerable weight on the nature of [the defendant's] crimes is both reasonable and consistent with precedent. . . . The court's emphasis on the seriousness of armed robbery in particular has also been echoed by other courts." (citing *United States v. Smith*, 178 F.3d 22, 26 (1st Cir. 1999))); *United States v. G.T.W.*, 992 F.2d 198, 200 (3d Cir. 1993) (affirming district court's transfer decision, noting that the "crime was calculated, since the boys acquired their gun two days before the robbery and mired their get-away car in the mud while 'casing' the bank earlier on the day of the robbery"); *United States v. Doe*, 871 F.2d 1248, 1255 (5th Cir. 1989) (upholding grant of motion to transfer where the district court found that the nature of the crime, armed robbery, was a particularly compelling factor favoring transfer); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *United States v. A.C.P.*, Cr. No. 04-159 (PG), 2005 U.S. Dist. LEXIS 11306, at *7 (D.P.R. Apr. 28, 2005) (Report & Recommendation) ("In cases such as the present, involving armed robbery . . ., the trend in published case law is to favor the transfer based on the violent nature of the offense itself. 'No court of appeals has ever found that a district court abused its discretion by failing to balance properly the six statutory factors. This includes every published case where the juvenile was transferred to adult status for the crime of armed robbery . . . .'" (quoting *Smith*, 178 F.3d at 26) (citing cases)), *adopted by* 379 F. Supp. 2d 225 (D.P.R. 2005); *J. Anthony G.*, 690 F. Supp. at 766 (granting motion to

transfer in a case where the defendant was charged with attempted armed robbery, noting that "the seriousness of this offense is perhaps the most critical factor in this case"); *United States v. J.D.*, 525 F. Supp. 107 (S.D.N.Y. 1981) (emphasizing the seriousness of the offense charged in a case where the defendants were transferred to adult status for having participated in an armed bank robbery); *see also United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."). Moreover, particular aspects of the armed robberies at issue in the instant case – namely, the fact that they occurred on multiple occasions and in connection with gang activity – further amplify the seriousness of the crimes charged. *See Doe*, 49 F.3d at 867-68 (agreeing with district court's finding that the nature of the offenses factor weighed heavily in favor of transfer upon a consideration of the details of the robbery with which the defendant was charged, the workings of the gang the defendant was alleged to be a part of, and the defendant's role and degree of activity within the gang). Thus, the Court finds that this factor not only overwhelmingly weighs in favor of transferring the defendant to adult status, but that it should be afforded more weight than any of the other factors in the transfer analysis.

C. Nature and Extent of Any Prior Delinquency Record[7]

The criminal history reports run for the defendant reveal that he has no prior criminal convictions. Moreover, the government has not produced any court records indicating that the defendant has a

---

[7] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.*, 203 F.3d 955, 962 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 315 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor" (citation omitted)). *But see In re Sealed Case*, 893 F.2d 363, 369 n.12 (D.C. Cir. 1990) ("But since . . . the purpose of the Act is rehabilitation and not punishment, Congress could not have contemplated the hearing to focus on a plethora of uncharged and unproven offenses."). In any event, this Court need not resolve this question because the defendant has no prior arrests or convictions.

prior delinquency record.[8] Accordingly, the Court finds that this factor weighs against transfer. However, the Court notes that an absence of a prior delinquency record is not dispositive in a transfer determination and does not preclude the transfer of a defendant to adult status when, as in the instant case, a balancing of all of the statutory factors (including this one) weighs in favor of transfer. *See*, *e.g.*, *Juvenile Male*, 554 F.3d at 468-70 (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background); *J. Anthony G.*, 690 F. Supp. at 764-65 (granting government's transfer motion despite defendant's lack of a prior juvenile record).

D. Juvenile's Present Psychological Maturity and Intellectual Development

As noted *supra*, the defendant was evaluated by licensed psychologists, Dr. L. Thomas Kucharski and Dr. Virginia Berber-Riojas. Defense counsel provided the Court with a copy of their report. For the reasons set forth *infra*, the Court finds that the defendant's intellectual development and psychological maturity, as discussed in the report, weigh in favor of transfer.

As an initial matter, Dr. Kucharski and Dr. Berber-Riojas reported that the defendant: (1) exhibited "no evidence of cognitive impairment or significant immaturity," and (2) presented no significant mental health difficulties. (Kucharski & Barber-Riojas at 4.) Although Dr. Kucharski and Dr. Berber-Riojas noted that the defendant's "insight and judgment appeared limited," they nonetheless found that the defendant's thoughts were "logical, rational, and coherent," he exhibited "no symptoms of mania," and his "attention, memory, and concentration were within normal limits." (*Id.* at 3-4.) They also noted that the defendant reported having begun GED training while incarcerated. (*Id.* at 5.) Thus, it is clear from the report that the defendant possesses sufficient intellectual capacity and psychological maturity to, if he so chose, conform his conduct to the law and to appreciate the gravity of the charges he is facing.

Furthermore, of great concern to the Court are Dr. Kucharski's and Dr. Berber-Riojas's findings that the defendant "presented with several antisocial personality traits, such as lack of remorse for his criminal behavior, justification of criminal activities, lack of empathy for his victims, and externalization of responsibility." (*Id.*) In addition, Dr.

---

[8] Section 5032 states that "[a] juvenile shall not be transferred to adult prosecution . . . until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record . . . ." 18 U.S.C. § 5032. The Second Circuit has recognized, in relation to a prior version of Section 5032 that required such records be produced before commencement of juvenile proceedings, that "[w]hile the language of the record certification provision of § 5032 is amenable to strict interpretation . . . most courts have read the records certification provision to require only good faith efforts by the government to provide the court with documentation of a juvenile prior record (or to the effect that no such record exists or is available)." *United States v. Wong*, 40 F.3d 1347, 1369 (2d Cir. 1994). In this case, it is undisputed that the defendant has no prior criminal record in the United States and, as such, the Court finds that the criminal history reports submitted to the Court, which reflect the defendant's complete lack of a criminal history, demonstrate the government's good faith efforts to comply with the terms of Section 5032.

12

Kucharski and Dr. Berber-Riojas noted that the defendant "presented with a shallow affect not showing emotion when discussing negative events or when being confronted by the examiners on some of his criminal behaviors or life choices" and "admit[ted] to having engaged in criminal behavior as part of his gang activity, such as having weapons or robbing people at gunpoint." (*Id.*) It was reported that the defendant "appears to harbor a mindset that is pro-criminal in nature."[9] (*Id.*) Moreover, "[w]hen questioned as to his treatment needs, [the defendant] was unable to identify any significant psychological deficits or psychological difficulties that would be the focus of treatment." (*Id.*) Accordingly, the Court finds that the defendant's intellectual development and psychological maturity both weight strongly in favor of transfer. *See A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); *H.V.T.*, 1997 WL 610767, at *5 ("Both psychologists testified that H.V.T.'s intelligence was probably in the low average range, indicating no mental retardation. As to psychological maturity, both experts agreed that H.V.T. lacks emotional and psychological resources. Dr. O'Neill characterized H.V.T.'s behavior as distant. However, again no evidence was submitted indicating that H.V.T. has the psychological maturity of a child. Dr. O'Neill testified that there was no indication that H.V.T. was out of touch with reality but that H.V.T.'s traits were characterological, fixed, and persistent and that they were unlikely to change over time. I find that the intellectual development and psychological maturity factor favors transfer." (internal citations omitted)).

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

There is no evidence that the defendant received any prior treatment or counseling. (*See* Kucharski & Barber-Riojas at 3 ("[The defendant] denied a history of mental health difficulties or treatment.").) Accordingly, this factor is neutral in the transfer analysis. *See Juvenile Male*, 554 F.3d at 469 (finding that responsiveness to past treatment efforts factor neutral where defendant had not been enrolled in any formal treatment program).[10]

---

[9] Although Dr. Kucharski and Dr. Berber-Riojas report that "[p]lacement in the adult correctional system would likely reinforce and enhance [the defendant's] criminal attitudes," they indicate that if defendant were placed, by contrast, in a juvenile correctional facility, he only "*might* receive treatment to reduce his antisocial orientation and to help him develop a noncriminal lifestyle," and further imply that any such change is "difficult to accomplish" in either environment, be it an adult or juvenile correctional facility. (Kucharski & Barber-Riojas at 5 (emphasis added).) In any event, the Court does not believe that this possibility of positive treatment in a juvenile correctional facility is sufficient to overcome the other factors that overwhelmingly favor transfer.

[10] The Court notes that, although there have been no past formal efforts at treatment, the defendant has a "significant history of misconduct during school with several suspensions" (Kucharski & Barber-Riojas at 5), indicating his repeated failure to respond to the school system's reprimands. *See J. Anthony G.*, 690 F. Supp. at 764 ("To some degree, the educational process could be considered analogous to an effort at 'treatment.' Despite the availability of educational opportunities, [the defendant] has totally rejected anything that the school system has to offer him."). In addition, given the defendant's misconduct at school and his long-term allegiance to the violent MS-13 gang, "it will be difficult for [the defendant] to adjust to . . . accepting newly imposed guidelines and behavioral modes." *United States v. Means*, 575 F. Supp. 1068, 1072 (S.D. 1983). Thus, although the Court deems this factor to be neutral due to the lack of prior formal treatment efforts, informal indicia of the defendant's responsiveness to treatment weigh in favor of transfer.

13

### F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserts that, according to the Northeast Regional Office of the Federal Bureau of Prisons ("BOP"), there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 24.) Instead, such individuals from the district would be sent to state contract facilities for juveniles in Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*)

The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Thus, the Court again finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (internal citation, alterations, and quotation marks omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. As an initial matter, the defendant is charged with six armed robberies in connection with his alleged participation in the violent activity of the MS-13 street gang. These are precisely the types of serious and violent crimes that strongly weigh in favor of transfer. In addition, the defendant allegedly committed these crimes between the ages of 17 years and 6 months and 17 years and 8 months, and thus was almost an adult. Moreover, a review of the factors demonstrates that the defendant is not likely to respond to rehabilitative efforts if he is convicted of the charged crimes and provided with juvenile rehabilitation programs. Indeed, Dr. Kucharski and Dr. Barber-Riojas reported that the defendant "harbor[s] a mindset that is pro-criminal in nature," and that, if placed in a juvenile facility, he *might* receive treatment to moderate his "pro-criminal" mindset and "antisocial orientation," but noted that "such change is difficult to accomplish." (Kucharski & Barber-Riojas at 5 (emphasis added).) Furthermore, the fact that the defendant is already 19 years old, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal citations and quotation marks omitted)); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th

birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). The Court finds, therefore, that the rehabilitation potential for the defendant – who "harbor[s] a mindset that is pro-criminal in nature" and possesses "antisocial personality traits" (Kucharski & Barber-Riojas at 5) – is extremely low, and short-term rehabilitation efforts in a juvenile program are likely to be futile.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal citation and quotation marks omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal citation and quotation marks omitted). Accordingly, given that the crimes charged here are very serious, and given that the record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

## IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted. It is hereby ordered that the defendant is transferred for criminal prosecution as an adult for the criminal acts alleged in the Juvenile Information.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 11, 2013
      Central Islip, New York

\*  \*  \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 by Raymond A. Tierney, Assistant U.S. Attorney. The defendant is represented by Richard A. Miller, Miller & Skubik LLP, 356 Veterans Memorial Highway, Suite 3, Commack, NY 11725.